UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DIMITRIOS GEORGE CECIL,

     Plaintiff,

v.                                Case No. 05-71805

VIACOM OUTDOOR GROUP, INC.,       HONORABLE AVERN COHN
COMBINED COMMUNICATIONS
CORPORATION, d/b/a GANNETT OUTDOOR
CO. OF MICHIGAN,

     Defendants.

_____/

**MEMORANDUM AND ORDER DENYING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I.  Introduction

This is a property dispute over damages.  Plaintiff Dimitrios George Cecil (Cecil) is suing defendants Viacom Outdoor Group (Viacom) and Combined Communication Corp. d/b/a Gannett Outdoor Co. of Michigan (Gannett)(collectively Viacom) claiming a right to damages for the use of his property.  Specifically, Cecil seeks damages in the form of unpaid rent for Viacom's use of a billboard on the property.  Viacom does not deny liability; rather it disputes the amount to which Cecil is entitled.

Before Court is Cecil's motion for summary judgment seeking $88,240.00 in unpaid rent.  For the reasons that follow, the motion is DENIED.  There is a factual question as to the reasonable value of the property during the past six years.  However, as Viacom concedes it owes Cecil money, the parties should settle the case, either

themselves or with the services of a mediator to resolve their dispute.

## II. Background

The material facts as gleaned from the parties papers follow.

The property at issue is located at 177 West South Boulevard in the City of Pontiac. A billboard originally owned by Gannet has been located on the property for some years. The property was originally owned by Eilender Investment Company (Eilender).

On September 15, 1991, Gannett's corporate successor, Viacom, and Eilender entered into a three year "Ground Lease" agreement that allowed Viacom to maintain the existing billboard on the property for an annual payment of $250.00. Viacom also had the right to renew the lease from year to year. The lease also stated that if the property was sold, the new owner "may cancel the lease on a 30 day notice from date of purchase."

On August 3, 1994, Cecil purchased the property from Eilender.

On August 26, 1994, Cecil sent a letter to Viacom, stating in relevant part:

> Subject: New owner lease agreement and terms for 177 West Boulevard, Pontiac, Michigan...
> Gentlemen, as the new owner ... I am providing you with the price and terms for the new lease for 1994 through 1995. Please amend your standard lease agreement document accordingly and forward it to me for approval and signing.
> ...
> One [1] year agreement, cancelable with 30 days notice from either party. Cost of lease per month $520.00 ...
> Payments of $520.00 will be made 15 days in advance of rent due date of the 15th of each month.

Viacom did not respond to the letter.

Thereafter, from September 13, 1994 to December 10, 1994, Cecil sent notices

2

and invoices to the attention of Mike Van Hafeen at Viacom for the new rent of $520.00

per month and demands for payment.  The September 13, 1994 letter states in part:

> Subject: Non-Response to the new owner lease agreement and terms...
>
> I have not received and response either verbal or written to my 1st letter and our 1st phone contact.[1]  Please define your position today, September 13, 1994 **your lease ends on 9.14.1994.**

Viacom did not respond to any letters or invoices until January 5, 1995 when

Mike Van Haften (not Hafeen) responded for Viacom as follows:

> Viacom does not accept your invoices for $520.00 per month.
> As hold over tenants, the annual rent is $250.00 per year.  However, we would be willing to pay $1,200.00 per year to remain on your property.
> Please notify me as soon as possible so that I can either schedule removal during January or renegotiate a lease that is beneficial to both you and [Viacom].

Cecil responded on January 10, 2005 requesting payment of $520.00 for the past

several months.  Letters were also sent on January 15, 1995 and February 10, 1995

entitled "NOTICE NO TRESPASSING" and informing Viacom that it should not have

any Viacom personnel enter the property and "either remove or change the sign."  In

both letters, Cecil stated:

> I am willing to negotiate the lease agreement, but, your lease agreement offer of $1200 per year is far too low, relative to both my lease amounts as well as the rental charge from [Viacom] to its [sic] advertisers for monthly sign rental free.  Please, be more realistic on lease amounts.

Viacom did not respond to Cecil's letters.

There is no record of any further discussion between the parties.

---

[1]Viacom, through Mike Van Haften, does not recall speaking to Cecil; however, he states in his affidavit that he is certain that he would have informed Cecil that Viacom would not be willing to pay $520.00 per month for its use of the property.

Amazingly, for the next ten years, the parties were at a standstill.  Cecil continued to invoice Viacom, raising the monthly rate throughout the years, eventually to $1050.00 per month in 2004.  Viacom never responded or paid Cecil any money for the use of the property.

Finally, on April 13, 1005, Cecil sued Viacom in Oakland County Circuit Court, claiming (1) account stated, (2) breach of contract, (3) unjust enrichment, and (4) trespass.  Cecil seeks damages of $141,442.00 plus interest, costs, and attorney fees.

Viacom removed the case to federal court on the grounds of diversity jurisdiction.  In July 2005, Cecil sold the property to a non-party for $65,000.00

### III.  Legal Standard

### IV.  Analysis

Some undisputed facts important to note are:

1. Viacom has never paid Cecil any money for the use of the property since Cecil purchased it in 1994.

2. Cecil concedes that his damages go back only six years by virtue of the application of the statute of limitations.

3. Other than sending letters and continuing to invoice Viacom for rent, Cecil has never attempted to remove Viacom from the property until the filing of the instant case.

4. Viacom does not dispute that it owes Cecil money for the use of his property; it does dispute the amount owed.

### A.

Cecil frames the dispute in contractual terms, i.e. that he offered a new lease at

4

$520.00 per month and Viacom accepted the lease by not objecting or otherwise responding.  Cecil also argues that the original lease between Eilender and Gannett was a license, not a lease, therefore Cecil had a right to revoke it at will.  Finally, Cecil says that its damages are documented by its regular billings to Viacom for the last six years, which it says is $84,740.00.  This amount represents monthly rental payments ranging from $900.00 per month to $1050.00 per month plus interest.

In response, Viacom says that principles of property law, not contract law, control.  Viacom also says that there are two material questions of fact: (1) whether Cecil accepted Viacom's implied offer to renew tenancy on an annual basis at the rate in the September 1991 lease and (2) even if Cecil did not accept the renewal, is Cecil only entitled to the amount of reasonable rent, which amount can only be determined by a trier of fact.

### B.

Viacom is correct that property law governs this dispute.  First of all, the agreement between Eilender and Gannett is a lease, not a license.  A lease is defined as "a conveyance by the owner of an estate of a portion of the interest therein to another for a term less than his own for a valuable consideration."  De Bruym Produce Co. v. Romero, 202 Mich. App. 92, 98 (1993).  The plain language fo the agreement confirms this relationship; it uses the term "lease," stating that "Lessor hereby lease[s] and demise[s] to [Viacom] the entire plot or premises described as South Blvd & Highland, SW Corner lots #13 - 14 ..."  It also provides that "Lessee shall have the right to erect, place, and maintain advertising sign structures and equipment therefore on the demised premises and post, paint, illuminate and maintain advertisements on such

5

structures." It also had a defined term of years (3 years which was renewable) with a set amount of consideration ($250.00 per year).

Cecil relies on Outdoor Sys. Advertising, Inc. v. Korth, 238 Mich. App. 664 (1999) and Lewis v. Baxter Laundries, 245 Mich. 216 (1931). In Lewis, the court, in a very brief opinion, determined that the writing between the parties regarding the using and maintaining advertising signs was not a lease even though it stated that defendant had the right to "let and lease and give ... exclusive permission" to erect and maintain signs on the roof of plaintiff's building. The court found that because "the writing here does not confer possession of premises on defendant [but] gives mere permission under the owner to have and maintain a sign or signs on the roof, [i]t is a license not a lease." Here, however, the lease agreement expressly provided Viacom with the right to use "the entire plot or premises" of the property. Thus, Lewis, is not on point.

Outdoor Sys. actually supports Viacom's position that the agreement is a lease. That case involved the ownership of plaintiff's billboard under a prior lease agreement with the parties' predecessors in interest. The issue in the case was not whether the plaintiff has a license or a lease, but rather whether the billboard structures were fixtures.

In short, the agreement is a lease, not a license.

C.

Second, contrary to Viacom's argument to the contrary, there is no disputed question of fact as to whether Cecil accepted any "implied offer" to renew the tenancy on the rate in the September 1991 lease. The record is clear that Cecil clearly did not wish to continue the lease at the $250.00 per year rate.

6

D.

1.

Thus, the only real issue before the Court is what damages Cecil is entitled to for the last six years of Viacom's occupation of the property rent free.  The answer lies in the parties' rights and obligations after the expiration of the September 1991 lease.  Specifically, in defining Viacom's status and the rights of the parties as a result of Viacom's status.

Michigan law recognizes three types of landlord/tenant relationships.  A "tenancy at will" is a tenancy which has no definite term and which may be terminated at the discretion of either party.  In contrast, an "estate for years" is a tenancy which has a fixed, ascertainable term (either a year or some other period) which may not be unilaterally shortened by either party.  However, both a tenancy at will and an estate for years share the common characteristic of being based upon an agreement between the parties, either express or implied, that the relationship between them is to be that of landlord and tenant.  See generally, John G. Cameron, Jr., Michigan Real Property Law; Principles and Commentary, pp. 867-700 (2d ed. 1993).  The third type of relationship is a tenancy at sufferance, discussed below.

Under Michigan law, "when a tenant comes rightfully into possession of land and continues to occupy it after the expiration of the period allowed by the owner, the tenant becomes a tenant at sufferance."  Cameron, supra, at p. 869.  Ryal's, Inc. v. Stavropoulos, 273 Mich. 680, 681 (1935).

A "tenancy by sufferance" is similar to a tenancy at will in that its term is also indefinite and either party may terminate the tenancy at its discretion.  A tenancy by

7

sufferance is distinguished from a tenancy at will by the fact that there is no landlord/tenant relationship between the parties.  The occupant of the premises simply holds possession at the "sufferance" of the owner.  The common characteristic of all tenancies by sufferance is that the occupant at some prior point in time had the right to possess the premises.  The prior right to possession must have also arisen by agreement, not as a matter of law.

Here, Viacom is properly considered to be a tenant at sufferance.  That is, Viacom had the right to occupy the property under the lease.  When the lease expired, and Cecil proposed new terms, Viacom continued to occupy the property for the next several years.  While Cecil contends that in order to be a tenant at sufferance, the lease must have arisen between Cecil and Viacom, not its predecessors in interest, this is incorrect.  At the time Cecil purchased the property, he succeeded to the rights and obligations of Eilender, which included that the property was subject to a lease. Moreover, at the time of purchase, the lease was still in existence.

Importantly, Cecil did not consent to Viacom's possession fo the property such as to create a renewal tenancy by holding over.  "[W]here a tenant under a written lease by a fixed term holds over after the term expires, the landlord may treat the tenant as a trespasser or as a tenant holding over under the terms of the original lease. ... In the latter situation, the landlord must consent to or acquiesce in the holding over to create a renewal of the tenancy by operation of law.  Cameron, supra at p. 893.  The landlord usually demonstrates consent by accepting rent.  Here, Viacom paid no rent and Cecil continued to invoice Viacom at increasing rates while also sending notices of trespassing.  It cannot be said under these circumstances that Cecil consented to

8

Viacom's holding over.  As such, Viacom is a tenant at sufferance.

The question then becomes what are Viacom's obligations as a tenant at sufferance.  "At common law, a tenant by sufferance was not liable for rent, since there is no contractual relationship of landlord and tenant.  It has been held, however, that a tenant is liable for his or her use and occupancy of the premises after receiving notice to quit."  Cameron, <u>supra</u>, at p. 869.

Blackstone described a tenant at sufferance as follows:

> An estate at sufferance, is where one comes into possession of land by lawful title, but keeps it afterwards without any title at all.  As if a man takes a lease for a year, and, after the year is expired, continues to hold the premises without any ... leave from the owner of the estate.  Or, if a man maketh a lease continues possession, he is a tenant at sufferance. ...[i]n the case of a subject, this estate may be destroyed whenever the true owner shall make an actual entry on the lands and oust the tenant; for, before entry, he cannot maintain an action of trespass against the tenant by sufferance, as he might against a stranger: and the reason is, because the tenant being once in by lawful title, the law (which presumes no wrong in any man) will support him to continue upon a title equally lawful, unless the owner of the land ... will declare his continuance to be tortious, or, in common language, wrongful.
> Thus stands the law, with regards to tenants by sufferance; and landlords are obliged in these cases to make formal entries upon their lands, and recover possession by the legal process of ejectment: and at the utmost, by the common law, the tenant was bound to account for the profits of the land ... by him detained.

2 Blackstone Comm. 150-1.

The law in Michigan follows Blackstone.  An owner of land subject to a tenancy by sufferance may not recover rent from an occupant holding possession pursuant to the tenancy.  <u>Hogsett v. Ellis</u>, 17 Mich. 351 (1868).  The courts concluded that an owner has no one to blame but itself for allowing a tenant by sufferance to occupy its land rent-free.  If the owner wanted relief, then it had only to "suffer" the occupant's possession no more by evicting the unwanted tenant.

9

However, even if the owner of the land does not acquiesce to the hold-over, and therefore the hold-over remains a tenancy by sufferance, the owner may still recover rent from the tenant if the owner makes an actual demand upon the occupant to return the premises.  The Michigan Supreme Court, in <u>Hogsett</u>, explained the reason for this exception.

> But, upon principle in the case put, of a tenant for years, holding over after the expiration of his term.  There may be some reasonable ground for saying that, until such notice or demand of possession, it is the landlord's own folly or negligence to suffer the tenant to remain; since, if he wanted the possession, he ought to demand it, or re-enter; and that, until he shall indicate to the tenant his wish to have the premises, the tenant may infer that he does not wish the possession, or that the tenant shall leave the premises vacant, nor intend to insist upon rent, or he would say so.
> But after the rightful estate (as the tenancy for years) is terminated, and the landlord gives the tenant notice to quit, and demands the possession, this is as clear an indication of his desire to have the possession as an actual entry would be; and the tenant who has refused to give up the possession when this demanded, can not justly be heard to complain that the landlord has been guilty of laches for not putting him out by force, or resorting to legal process to that end; nor to claim that for this laches he ought to be allowed use of the property without compensation.  It is little short of absurd to hold that, in such a case, the landlord has been guilty of such laches as should deprive him of all compensation for the use of his property.

As a result, the rule in Michigan is that a property owner may recover an amount representing the reasonable value for the use of the property during the relevant period.  <u>See Hogsett</u>, <u>supra.</u>

Here, Cecil made such a demand upon Viacom such that he is entitled to reasonable compensation for Viacom's use of the property.

2.

The parties dispute the amount owed.  Cecil says that the amount it invoiced Viacom for over the years, reflecting increasing rents, is reasonable.  Viacom, however,

10

says that the increases are substantially more than the amount due under the original lease, far exceed the amount Viacom pays for the use of billboards on other similar properties, and are unreasonable in light of the revenues it generates from the billboards.  In other words, Viacom says that Cecil cannot unilaterally determine what is reasonable compensation.  Because there is a disputed issue of fact as to whether the rent increases Cecil's claims as damages truly reflect a reasonable value of the property, Cecil is not entitled to summary judgment.

SO ORDERED.


___s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated:  September 8, 2005
        Detroit, Michigan